Christine **BENAVIDES**, Plaintiff,

v.

**JACKSON NATIONAL LIFE INSURANCE COMPANY,** Defendant.

Civ. A. No. 92–F–65.

United States District Court, D. Colorado.

May 6, 1993.

Walter J. Hopp, Jennifer L. Motycka, Hopp & Associates, P.C., Longmont, CO, for plaintiff.

John W. Cook, John W. Cook, P.C., Colorado Springs, CO, for defendant.

## ORDER REGARDING ORDER AND MANDATE DIRECTING VACATUR

SHERMAN G. FINESILVER, Chief Judge.

This is a case involving a contested life insurance policy. Jurisdiction is based upon 28 U.S.C.A. § 1441(a). We entered a final judgment in this matter on November 17, 1992 and the judgment was appealed. This matter comes before the District Court following the order of the Court of Appeals for the Tenth Circuit directing this Court to vacate its prior judgment and order and to dismiss the complaint. For the reasons explained below, we must respectfully decline to vacate our prior judgment pending a reasoned and more detailed order from the Court of Appeals.

### I.

On March 29, 1989, Epitacia Benavides and his wife, Plaintiff Christine Benavides, entered a State Farm Insurance Office to inquire about buying a life insurance policy. After a meeting with two agents of Defendant Jackson National Life Insurance Company, the facts of which were disputed in the parties' briefs on Jackson's motion for summary judgment, Mr. Benavides decided to purchase the policy. On the questionnaire he filled out to accompany his policy application, Mr. Benavides denied having any past or current medical problems.

The agents issued Mr. Benavides an "Interim Insurance Receipt" ("Interim Receipt" or "Receipt"), dated, like the Application, March 29, 1989. The Interim Receipt provided that Mr. Benavides would be insured by Defendant until Defendant either rejected or approved his application. If Defendant approved the application, a more permanent policy would be issued. The Receipt stated that it would terminate automatically when Jackson approved the policy. The Receipt also stated that it was "not a binder." As consideration for the Interim Receipt, Mr. Benavides paid his first premium in the amount of $40.29. On April 17, 1989, Defendant issued Mr. Benavides a life insurance policy ("the Final Policy").

Mr. Benavides paid his insurance premiums until April 3, 1991, when he died of atherosclerotic cardiovascular disease. Approximately two weeks later, Mrs. Benavides presented her claim as the primary beneficiary of the policy. Upon researching Mr. Benavides' medical history, Defendant concluded that he had materially misrepresented his health on his application and accordingly denied payment of benefits. Plaintiff filed suit in state court on December 13, 1991, alleging breach of contract. Defendant raised as a defense Mr. Benavides' alleged material misrepresentation regarding his health. Defendant filed a motion for summary judgment, and Plaintiff was later granted leave to move for summary judgment on her own behalf.

■ The issue before this Court in its prior order was whether the Policy was incontestable as of the date of Mr. Benavides' death. In an order and judgment unfavorable to Jackson, we concluded the Policy's incontestability clause was ambiguous and that a finding of incontestability would

thwart the purpose and policy behind the statute providing for incontestability clauses. Jackson filed notices of appeal with the Tenth Circuit Court of Appeals on December 16, 1992 and January 29, 1993, but before appeal could be perfected on the merits, on April 2, 1993, the parties filed a joint motion to vacate and ·dismiss. On April 9, 1993, the Court of Appeals, stating that the appeals had been settled and were dismissed as moot, further directed this Court to vacate its prior judgment in the case. The order, in its entirety, states:

> Pursuant to Rule 42(b), Fed.R.App.P., and the ·Joint Motion To Vacate and Dismiss submitted by the parties, these appeals have been settled and are hereby dismissed as moot. The case is remanded to the district court with instructions to vacate the judgment entered on November 23, 1992, and the subsequent judgment entered on December 23, 1992. The district court is further directed to dismiss the complaint. *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40 [71 S.Ct. 104, 106–07, 95 L.Ed. 36] (1950); *Beattie v. United States,* 949 F.2d 1092, 1095 (10th Cir.1991); *Tosco Corp. v. Hodel,* 826 F.2d 948 (10th Cir.1987).
>
> Each party shall bear its own costs and the mandate shall issue forthwith.

## II. VACATUR

The Court of Appeals cited as authority for its order of vacatur three cases, including *United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950), *Beattie v. United States,* 949 F.2d 1092, 1095 (10th Cir.1991), and *Tosco Corp. v. Hodel,* 826 F.2d 948 (10th Cir.1987). We do not believe these cases are responsive to the · issue in the instant matter.

### A. The Rule and Rationale of the Supreme Court

In *Munsingwear,* the United States' allegations of price-fixing by the defendant became moot when, while the case was pending appeal, the commodity involved was deregulated. The Court established the rule that judgments rendered below should be vacated when cases, by chance, become moot pending appeal. 340 U.S. at 39, 71 S.Ct. at 106. The rule "clears the path for future relitigation of the issues between the parties and eliminates a judgment, *review of which was prevented through happenstance.*" *Id.* at 40, 71 S.Ct. at 107 (emphasis added). *Munsingwear* thus preserves the rights of the parties and ensures that no party is subject to res judicata on a claim or issue which it cannot appeal. On the other hand, "*Munsingwear* teaches that when a case is mooted through no fault of the parties, the maintenance of the judgment may be prejudicial to a party who has lost the opportunity to challenge such a judgment on appeal." *See* Jill·E. Fisch, *Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur,* 76 CORNELL L.REV. 589, 592–93 (March 1991) (hereafter *Rewriting History* ).

In *Karcher v. May,* 484 U.S. 72, 81–83, 108 S.Ct. 388, 391, 98 L.Ed.2d 327 (1987), the Court further clarified the rule in *Munsingwear.* The presiding legislative officers of the New Jersey legislature had twice lost in the lower courts when those courts determined that New Jersey's law mandating a moment of silence in schools was unconstitutional. Before appeal was filed in the Supreme Court, the appellants lost their posts as presiding officers and their successors withdrew the legislature's appeal. The Court declined to order vacatur of the lower courts' judgments because the case was moot for lack of jurisdiction. Further articulating the *Munsingwear* rationale, the Court stated "the controversy did not become moot due to circumstances unattributable to any of the parties." *Id.* 484 U.S. at 83, 108 S.Ct. at 391. Rather, the losing party, represented by new officers, voluntarily declined to pursue any appeal.

█ The rule, then, for vacating judgments is that (1) the case must become moot and (2) that it must become moot through no controllable, voluntary action attributable to the parties.

### B. Vacatur in the Tenth Circuit

One of the cases cited by the Tenth Circuit in its brief instruction to vacate is entirely distinguishable on its facts from the instant

case and the other, like the order of vacatur in this case, does not address the policies against vacatur and the limitations imposed by the Supreme Court.

For example, in *Beattie*, a firefighter with the Boeing Military Airplane Company brought suit for declaratory judgment and injunctive relief against the United States, alleging that the Air Force's denial of his access to certain sensitive areas violated his constitutional rights. Before the case even came before the district court on summary judgment, the plaintiff voluntarily quit his job. The district court nevertheless found the case was not moot and ruled on the motion for summary judgment. The Tenth Circuit reversed, concluding the case was moot at the time the district court had entered its judgment and therefore the district court lacked jurisdiction to enter judgment in a moot case. 949 F.2d at 1095. Unlike the case before us, *Beattie* was moot before the district court even ruled on it. The Court of Appeals properly concluded no judgment could enter on an already moot case.

In *Tosco*, the Tenth Circuit addressed only briefly the issue of vacatur. It did not illustrate why vacatur was appropriate in that case but rather cited two distinguishable Supreme Court cases without explanation of their applicability. 826 F.2d at 948 (*citing Iron Arrow Honor Society v. Heckler*, 464 U.S. 67, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) (holding that university's new policy against discriminatory acts of all-male honorary society mooted the society's appeal seeking to prevent Secretary of Health, Education and Welfare from interpreting the law to require the university to ban society's activities from campus); *Great Western Sugar Co. v. Nelson*, 442 U.S. 92, 99 S.Ct. 2149, 60 L.Ed.2d 735 (1979) (holding that completed arbitration pending appeal mooted district court's order directing arbitration)).

■ Both *Iron Arrow* and *Great Western* found vacatur proper only where changed circumstances prohibited the appeals courts from granting relief from the judgment below. In *Iron Arrow*, the university's policy had changed such that the Secretary's inter

pretation became irrelevant; "whatever the correctness of the Secretary's interpretation of the regulation in question, the University has stated unequivocally that it will not allow Iron Arrow to conduct its initiation activities on University property." Therefore any complementary instruction by the Secretary was moot. 464 U.S. at 70–71, 104 S.Ct. at 374–75. In *Great Western*, the decision ordering arbitration was moot and unchallengeable once arbitration had already begun and run its course. However, settlement in no way moots a case, *see, e.g., Nestle Co. v. Chester's Mkt., Inc.*, 756 F.2d 280, 281 (2d Cir.1985), as will be explained below.

**C. Policy in Support of Limited Application of the Rule**

■ That *Munsingwear* is inapplicable to situations involving settlements of cases pending appeal is amply illustrated by both the Supreme Court's recent grant of certiorari on the issue [1] and the division among the circuits on vacatur of district court judgments. The Third, Seventh, and District of Columbia Circuits (the plurality of circuits) have held that requests for vacatur based on a post-judgment settlement should be refused. *Clarendon Ltd. v. Nu–West Indus., Inc.*, 936 F.2d 127 (3rd Cir.1991); *In re United States*, 927 F.2d 626 (D.C.Cir.1991); *In the Matter of Memorial Hosp., Inc.*, 862 F.2d 1299 (7th Cir.1988). The Ninth Circuit has adopted a balancing approach that essentially follows the plurality of circuits in distinguishing among cases made moot by circumstances and cases made moot by an act of the appellant. *Scott v. Iron Workers Local 118*, 928 F.2d 863 (9th Cir.1991); *National Union Fire Ins. Co. v. Seafirst Corp.*, 891 F.2d 762 (9th Cir.1989); *Ringsby Truck Lines, Inc. v. Western Conference of Teamsters*, 686 F.2d 720 (9th Cir.1982). The Second and Federal Circuits, stressing the importance of settlement and conservation of judicial and party resources, have held that district court judgments are subject to vacation when litigants enter into voluntary post-judgment settlements. *See, e.g., U.S. Philips Corp. v. Windmere Corp.*, 971 F.2d 728 (Fed.Cir.1992),

1. *See U.S. Philips Corp. v. Windmere Corp.*, 971 F.2d 728 (Fed.Cir.1992), *reh'g denied* (1992), *cert. granted by Kaisha v. Philips Corp.*, —— U.S. ——, 113 S.Ct. 1249, 122 L.Ed.2d 649 (1993).

*reh'g denied* (1992), *cert. granted by Kaisha v. Philips Corp.,* —— U.S. ——, 113 S.Ct. 1249, 122 L.Ed.2d 649 (1993) (granting certiorari on issue of vacatur's propriety following settlement); *Long Island Lighting Co. v. Cuomo,* 888 F.2d 230 (2d Cir.1989); *Smith Int'l, Inc. v. Hughes Tool Co.,* 839 F.2d 663 (Fed.Cir.1988); *Nestle Co.,* 756 F.2d 280.

As we explained in *Russell v. Turnbaugh,* 774 F.Supp. 597 (D.Colo.1991), we find the reasoning of the plurality of circuits more persuasive, particularly the exposition by Judge Easterbrook in *Memorial Hospital,* 862 F.2d at 1300–03. On the other hand, we believe the Court in *Nestle* read *Munsingwear* far too broadly, perhaps incorrectly, when it stated "district court judgments that become moot pending appeal must be vacated." 756 F.2d at 281. As we have previously noted, *Munsingwear* requires for vacatur not only that the judgment become moot, but that such mootness arise through no action of the parties. Furthermore, the Court in *Nestle* simply made a policy choice, which we are free to disregard and the Tenth Circuit free to reinstate, favoring settlements over the finality of judgments. *Id.* at 283. Although this Court has traditionally encouraged settlement during the pretrial phase of litigation, we believe the costs of vacatur following post-judgment settlements on appeal are too high.

Our opinion in *Russell* cited numerous authorities disapproving the lack of res judicata effect given vacated judgments, the prospect of continued litigation of settled cases, and the disincentive to early settlement at the trial level, where most settlement—and therefore the most conservation of resources—is achieved. *Id.* at 600; *see also* Fisch, *Rewriting History, supra,* at 592 (concluding that post-judgment vacatur distorts the settlement process, delays settlement to waste judicial resources, and engenders disrespect for the courts by "perverting" the judicial decision into a negotiable commodity). We noted that, contrary to the claims of the Court of Appeals in *Nestle,* vacatur may not be the policy most conducive to conservation of judicial resources. For example, we have relitigated issues already decided but later vacated after a dilatory settlement. In

*Tosco Corp. v. Hodel,* 611 F.Supp. 1130 (D.Colo.1985), after over two decades of litigation, several appeals to the Supreme Court, and the commencement of congressional oversight, the trial court poured substantial resources into crafting an exhaustive, widely-circulated, 86–page opinion that could have effectively served as a primer on the Mineral Leasing Act of 1920 and painstakingly detailed the economic, historical, and legal aspects of oil shale and other mineral leasing rights. The litigants settled their dispute pending appeal. The Tenth Circuit directed that the order and judgment be vacated. *Tosco,* 826 F.2d 948. As a result of the vacatur, many of the identical mining issues had to be relitigated in *Marathon Oil Co. v. Lujan,* 751 F.Supp. 1454 (D.Colo.1991), *aff'd in part and rev'd in part,* 937 F.2d 498 (10th Cir.1991).

Parties have ample opportunity to settle early on, before more and more judicial and party resources are expended on their behalf. For example, some magistrate judges in this district typically hold an average of three settlement conferences per litigant, and may hold as many as eight to ten per litigant in some complex and protracted cases. Yet vacatur provides no incentive for early settlement and in fact encourages litigants to roll the dice on a district court ruling so long as they can settle to pay their way out of both the ruling and the adverse precedent. *See id.* at 595–96. The Second Circuit's view that vacatur is conducive to settlement is not only empirically unsupported but runs contrary to the experience of this and other district courts: specifically, that vacatur saves far less in circuit court resources than, by its perverse incentive for litigants to stall on settlement until after judgment, it costs the district courts and the parties. Vacatur is simply not efficient judicial resource management.

We have agreed with the Seventh Circuit's view in *Memorial Hospital,* 862 F.2d at 1300, that a judicial decision is a public act, created with societal resources for the purpose of resolving current disputes and providing guidance in future matters. *Russell,* 774 F.Supp. at 595–96. Once a case is decided in a district court and the machinery of the

public's justice system begins to operate, the decision becomes a part of the court's and the country's jurisprudence. Particularly in an era in which opinions can be immediately transmitted and published across the nation via computer databases, decisions no longer belong merely to the litigants. Their precedential value can be diminished by an appellate court's vacation, but they can never be erased and their reasoning may continue to be followed. In *Russell*, we disapproved of the use of judicial opinions as a bargaining commodity and concluded that judicial decisions are not for sale. *Id.* We now elaborate on our views in *Russell* in order fully to illuminate the difficulties posed by vacating judgments based upon no more cause than that the parties have reached a settlement.

### D. Further Policy Implications of Judgment Vacation as a Condition of Settlement

In the normal and traditional operation of the American justice system, each party walks to the courthouse with a compilation of opinions in its favor under one arm and a collection of opposing views under the other. It is then not uncommon for the parties, under the court's supervision, to place the weight of case law for and against their positions on the appropriate side of the court's judicial scales. In many instances, particularly in litigation involving institutional litigators understandably enamored with the majority approach, one or both parties may state that "the weight of authority" supports their view. A string of citations follows. Courts may then, for understandable reasons, accept the majority view as the view tending toward more stability and predictability in the law and toward fewer accusations of renegade activism.

Given this background of deference to majority common law, vacatur becomes an important litigation tool, particularly for institutional litigators who must return to court many times with the same arguments. When a court rejects the arguments of institutional litigators such as Jackson, an insurance company, the institutions are dealt a crippling blow not only in the case at bar but in future litigation. Vacatur allows disap-

pointed litigators effectively to rewrite history. Vacatur allows them to control the direction and content of the jurisprudence—to weed out the negative precedent and preserve the positive—and create an artificially weighty and one-sided estimate of what comprises "the case law." This phenomenon has been amply catalogued in the mainstream legal literature. *See, e.g.,* Roger Parloff, *Rigging the Common Law*, THE AMERICAN LAWYER (March 1992); Gail Diane Cox, *Innovation—Or Just Court Triage?* NATIONAL LAW JOURNAL, Oct. 5, 1992, at 1.

A party that can erase negative precedent through vacatur views the lower court's judgment as a bargaining chip: in exchange for the victor's agreement to relinquish the precedential value of the judgment, the loser will offer some form of inevitably pecuniary sweetener. For example, the loser offers not to create the expense and risk of reversal inherent in appeal, or the loser may offer more in a settlement with the victor than the victor initially received, or even demanded in the complaint. At the same time, the victor, notably, is typically not a repeat litigator and has little interest in preserving the precedential value of the judgment below. The victor has little reason to resist vacatur and take its chances on appeal.

The case law becomes what the party with the greatest resources wishes it to be. Economic prowess purchases more persuasive power than the marketplace of ideas and sound reasoning combined. Vacatur allows wealthy litigants to become, in effect, editors of their own treatises on the subjects which concern them. We have no kind words for such a practice. We can imagine few practices condoned by the judicial system that would have a less salutary effect on both the reality and the perception of its integrity.

### III.

Accordingly, we must respectfully decline to vacate our prior judgment pending a reasoned and more detailed order from the Court of Appeals.